IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

IN RE INTEREST OF DESTINY U. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DESTINY U. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CLAUDIA F., APPELLANT.

Filed June 1, 2021.    Nos. A-20-828 through A-20-831.

Appeals from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Affirmed.

Jessica R. Meyers, Deputy Scotts Bluff County Public Defender, for appellant.

Danielle Larson, Deputy Scotts Bluff County Attorney, for appellee.

Katy A. Reichert, of Holyoke, Snyder, Longoria, Reichert & Rice, P.C., L.L.O., guardian ad litem.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

Claudia F. appeals the order of the county court for Scotts Bluff County, sitting as a juvenile court, terminating her parental rights to her four children. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Claudia is the mother of Amber R., born in 2003; Destiny U., born in 2006; Anthony J., born in 2011; and Jasmine U., born in 2013. None of the children's fathers have been a part of

- 1 -

their lives. Because none of the fathers are part of this appeal, they will not be discussed any further.

On March 21, 2020, the children were placed in the emergency temporary custody of the Nebraska Department of Health and Human Services (DHHS) after Claudia was arrested for a domestic assault incident with her live-in boyfriend. In addition to her incarceration, there were concerns that Claudia had been physically neglecting the children. The children were placed in foster care, where they have remained.

The State filed four separately docketed juvenile cases, one for each child; however, the allegations against Claudia in each case were the same. The State filed petitions on March 24, 2020, alleging that the children fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they were in a situation dangerous to life or limb or injurious to their health or morals, and/or because their parent neglected or refused to provide proper or necessary subsistence, education, or other care necessary for their health, morals, or well-being. The State specifically alleged that Claudia was unable to meet the children's needs for safety, stability, or basic care because of her mental health. The State also alleged that Claudia was currently incarcerated.

The State filed amended petitions on April 3, 2020, once again alleging that the children fell within § 43-247(3)(a). This time, however, the State specifically alleged only that the children lacked a safe and stable home.

At the first appearance hearing, held telephonically on April 7, 2020, Claudia admitted to the allegations in the amended petitions. Based on Claudia's admissions, the juvenile court adjudicated the children as being within the meaning of § 43-247(3)(a). The court ordered "[p]re-dispositional services" to include counseling and hair follicle testing for the children; and drug testing, a drug patch, and a parental capacity/dual diagnosis evaluation for Claudia.

The disposition hearing was held telephonically on May 28, 2020. Exhibit 1 (May 8 DHHS court report/case plan), exhibit 2 (three positive drug test results), and exhibit 3 (guardian ad litem report) were received with no objection. The juvenile court adopted the provisions of the May 8 DHHS case plan and directed all parties to comply with its terms, including any court ordered amendments. The DHHS case plan stated that Claudia would complete her parenting assessment on May 18 and follow the recommendations, work with the family support provider and informal supports, have supervised parenting time, complete Circle of Security, and maintain sobriety from all substances and have all negative drug patch tests. The court further ordered that visitation was to take place in a therapeutic setting, and that Claudia was to complete a parenting and substance abuse evaluation, and participate in team meetings.

On June 9, 2020, the children's guardian ad litem filed a "Motion for Visitation Hearing," alleging that, based on conversations with the children and their counselors, it was in the children's best interests that the juvenile court's order "further specify that the visits occur in a therapeutic setting <u>when therapeutically recommended</u>." (Emphasis in original.) After a hearing on July 2, the court ordered visitation with Claudia be temporarily suspended.

On July 17, 2020, the State filed a motion to terminate Claudia's parental rights to the children pursuant to Neb. Rev. Stat. § 43-292(2) and (4) (Reissue 2016). The State alleged that Claudia substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary care and protection; Claudia was unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior,

which conduct was seriously detrimental to the health, morals, or well-being of the juveniles; and termination of Claudia's parental rights was in the children's best interests.

A review hearing was held on August 25, 2020, at which an August 19 DHHS court report/case plan was received without objection. The juvenile court adopted the provisions of the August 19 case plan and directed all parties to comply with its terms, including any court ordered amendments. The terms of the August 19 case plan remained the same as the May 8 case plan, except the August 19 plan noted that Claudia did not make it to her May 18 parenting assessment so it was rescheduled for August 31. The court further ordered Claudia to participate in drug testing and to participate in her case plan. Suspended visitation was to continue as previously ordered.

TERMINATION HEARING

The termination of parental rights hearing was held on September 24, 2020. Several witnesses testified, and numerous exhibits were received into evidence without objection. We summarize the relevant evidence.

Courtney Armstrong was the DHHS child and family services specialist supervisor assigned to this family's case. She testified that the children were removed from Claudia's home on March 21, 2020, because Claudia was arrested and incarcerated, and there was no caregiver available for the children. DHHS provided the family numerous services, including case management, out-of-home foster care, family support, supervised visitation, virtual visitation, counseling, drug testing, letters of agreements for psychological assessments, gas vouchers, Circle of Security, and peer support. Claudia's communication with DHHS was "almost nonexistent." Armstrong stated, "There's been little periods where we've been lucky to catch her, but it's mostly because we're showing up at court." When DHHS did see Claudia, they would talk to her, confirm phone numbers and e-mail, and try to engage in conversation with her.

Kimberly Brehm was a family support worker assigned to this case. She testified that she supervised visits between Claudia and the children in April and May 2020. Because of the COVID-19 pandemic, the visits took place via Zoom; Brehm would e-mail an invitation to Claudia and the foster parents, and then Claudia and the children would visit on video while Brehm supervised and monitored. There were supposed to be five visits per week, and each of the children would get 15 minutes per visit. Claudia was not consistent in attending her visitation. In the beginning, she did well, but then it tapered off, and "she'd make one or two a week." Supervisor Armstrong stated that Claudia attended only 39 percent of her visits; of the 48 visits offered, she attended 19, and the other 29 were canceled or "no-showed." Brehm "observed a lot of hesitation" from the children during visits; Jasmine would stay on longer for the conversations, but the oldest three children did not want to talk to Claudia. Brehm stated they "accused [Claudia] of being fake, why are you smiling, you never smile you don't act this way, why do you even care"; Brehm would have to end those visits early. Armstrong testified that it was "very concerning" that the children "had no desire to even make any sort of effort to talk to their mom." In May, the visits moved from supervised to a therapeutic setting, but no therapeutic visits occurred.

Brehm stated she also provided family support to Claudia via Zoom. DHHS asked Brehm to work with Claudia on employment, housing, treatment, and counseling, and to provide transportation, if needed. Claudia also had to do a mental health evaluation, a parenting evaluation, and a drug and alcohol evaluation. Brehm said it was "a struggle" just to get the 2 hours of support

per week for which she was contracted. Claudia already had a job she enjoyed, so they did not work on employment. Claudia was living with friends and not worried about a place to live, so she and Brehm did not work on housing. Whenever Brehm brought up counseling and the evaluations, Claudia's response was, "'I am taking care of it.'" Brehm asked Claudia if she needed rides, but other than one request for a ride to a store, Claudia said she had friends driving her around. Brehm stated, "Really anything I asked her -- the only thing she really wanted was she wanted to see her kids [in person]." According to Brehm, Claudia believed the children were wrongly taken by the State. And Claudia also, at times, blamed her oldest child, Amber, for the removal, stating that Amber has brainwashed the other children.

In addition to supervised visits and family support, Brehm provided some of the drug testing for Claudia, utilizing a drug patch. Brehm would apply a patch to Claudia's skin and tell her to leave it there. Later, when Brehm removed a patch, it was packaged and sent to DHHS. Brehm put two patches on Claudia. For both patches, Brehm was concerned with tampering because when Brehm asked to see the patches during video visits, they were not in the same spot where Brehm had put them.

Supervisor Armstrong testified that Claudia had four drug patches sent to the lab. The patch on April 19, 2020, was positive for methamphetamine. The patches on April 26 and May 4 were both positive for methamphetamine and THC. And the patch on May 27 was positive for THC. After May 27, drug patches were placed on Claudia, but when providers attempted to get the patches off, Claudia refused or was unable to be located. Claudia was ordered to drug test at the last court hearing, but she said she needed to run across the street to get something from the store and then never returned.

Amber, 17 years old, did not testify at the hearing, but her deposition was received into evidence without objection. Amber described the physical harm Claudia caused her. When Amber was younger, Claudia would pull Amber's hair and "knock [her] against the wall, shove her head into the wall," and "push [her] down." Amber stated "[t]here were times that [Claudia] got mad that she'd stomp on me and there have been times where she's made my nose bleed because she hit me so hard." Claudia would also "smack us with frying pans . . . . I know the frying pan, that was a big thing for Destiny." Amber confirmed that she witnessed Claudia physically harm her younger siblings. At age 14, Amber "started fighting back in a sense," not physically fighting Claudia, but Amber said she "wasn't going to let [Claudia] harm me [or my siblings]." Amber stated, "When [Claudia would] like go after Destiny, I would be the one that stepped in and kind of block her off and we'd get into it."

At age 13, Amber "really started" being the caretaker for her siblings. She bathed them, made them food, made sure they got up in the morning, got them dressed and ready for school, and made sure they did their homework. Amber was also their "emotional support." Claudia "was never someone that they could go to" if they had a problem.

When Amber was a freshman in high school, she found out "for real" that Claudia was using drugs. Amber witnessed Claudia use drugs. Amber said that Claudia used marijuana and acid "in front of us," "showed us what it was," and offered it to "me and Destiny." When asked if Claudia used drugs up to the point that Amber and her siblings went into foster care, Amber responded, "I think so because I seen her with it, we smelled it."

Amber stated that during her lifetime, she had moved more times than she could count. The family moved for "a lot of different reasons." One time Claudia "couldn't like keep up with the rent or something so we were getting evicted," "[a]nother time was because of an ex she didn't want to be with anymore so we moved," other times Claudia "wasn't stable and just couldn't keep a job or anything," and "[o]ther times she just wanted to move just because she wanted to go somewhere else and start again." Amber confirmed that she had been homeless several times and had attended "[p]robably more than" 10 different schools. Amber missed her entire sophomore year of high school because Claudia did not enroll her in school. Amber started high school in Gering, Nebraska, in the fall of 2019. Even though she "was behind a whole year's worth" of school credits, at the time of her deposition in September 2020, Amber was a senior and was "just about to be" caught up on her credits because she worked hard over the summer.

Amber explained her living situations from the previous years. When Amber was 16 years old, Claudia, Claudia's late husband, and the four children lived in Alabama. In Alabama, the three younger children went to school, but Claudia never registered Amber in school. The children were often left alone, one time for 3 weeks. During that 3-week period, Amber took care of her siblings and rationed food out and made sure the younger siblings ate first. After the first 2 weeks, Claudia "dropped off a couple of groceries and she left again" for another week without saying where she was going. The children did not have a phone or car available to them, and there were no neighbors nearby. After Claudia came back, they packed up and moved to Florida because Claudia's husband had been arrested. The family was in a Florida hotel room for a couple of months, and once again, Amber did not go to school.

They then moved back to Alabama for a while, and after Claudia's husband got out on bond they moved to Wyoming, where they lived in tents for a month or two. Amber said that the tents were pitched "in some hills or something," "[w]e didn't take showers," and the bathroom was a "[h]ole in the ground." Claudia and her husband would leave the children alone. Amber stated, "It was hot," "[t]here was no shade," "[t]here was only the tents and the shrubs around us," "[a]nd we'd just be sitting there, in the sun all day"; there were "warm bologna sandwiches to eat" when they got hungry. Amber said "[i]t was almost like rotting away." One night in Wyoming, Amber confronted Claudia and said they could not live like that anymore, that Claudia could not just leave the children by themselves. Claudia and her husband started arguing and wanted to leave again, but Amber "wasn't having it." Amber got in the bed of the truck and "wasn't going to let them leave," but while Amber was in the bed of the truck, Claudia "took off going like 75 miles an hour swerving the truck back and forth trying to I guess knock me off . . . until she dropped me off at a hospital and left me." The doctors and a law enforcement officer questioned Amber to find out what happened, but she was "incoherent" and "overwhelmed" and "wasn't able to explain [herself]," so they transferred her to a youth crisis shelter. Amber was in the crisis shelter for a week before Claudia came back and got her.

The family then moved to Nebraska, near Scottsbluff, and lived in a camper; according to Amber, it was "just about to be" school time. Claudia's husband died within a couple of weeks of Amber getting to Scottsbluff. After Claudia's husband died, the family lived in a hotel for about a month, and then the five of them moved into a three-bedroom apartment in Gering; this would have been the fall of 2019.

In Gering, Claudia worked in a bakery. She subsequently met and started dating Brian D. Claudia also "met these [two] other kids, they were like 18," and they did not have a place to live, so Claudia let them live in the family's apartment; Brian also started living in the apartment as well. Prior to Amber's removal in March 2020, she witnessed domestic incidents between Claudia and Brian. Amber said there would be times where they would "throw things, yell slurs at each other," "[t]hey'd put their hands on each other," and "[o]ne time they punched a hole in the wall"; "It just gets bad."

Amber was asked what her relationship with Claudia was like. Amber stated, "I mean I care about her, I wouldn't want her to die or anything like that, but she wasn't a mother." When asked if she wanted to have a relationship with her mother, Amber responded:

At this point I'd say she has had lots of chances to form that and I've always -- I've talked to her about it. I've -- I've tried. I don't want to anymore because after her going through so many events in your life like that and seeing the same recurring things, there just comes a point to where you want the best for yourself and your siblings and not have to try for something that's never going to happen anymore or try for something that the other person doesn't even want.

Amber was "relieved" when she learned the State filed to terminate Claudia's parental rights. Amber believed termination was "what's best" because Claudia was "just not capable of being a mother." "She's not capable of taking care of children. She's not capable of providing the necessities a child needs to happily and safely grow up."

Destiny, 13 years old, did not testify at the hearing, but her deposition was received into evidence without objection. Destiny stated that she has moved more than 10 times in her life, and that she has attended "[p]robably more than 10 schools." Like Amber, Destiny recounted the family's various living situations from the previous years. Destiny's account of the family's various moves aligned with Amber's account. Destiny stated that when the family was living in Alabama, Claudia would frequently leave the children home alone, including one time when the children were left alone for a 3-week period. Destiny said that during that 3 weeks, Amber "took care of us" and there was "[v]ery little food." Destiny also recounted living in tents in Wyoming where it was "very hot, barely any food." It was in Wyoming when Amber and Claudia got into an argument. According to Destiny, Amber "jumped on the back of the pickup," and Claudia and her husband drove off. Claudia and her husband returned the next morning without Amber, and Claudia would not say what happened to her. Claudia told the children to "'grab all of [their] stuff'" and put it in the truck, and they "just left" and went to Nebraska without Amber. Later, Claudia told Destiny that Amber was in a shelter. Amber came back around the time that Claudia's husband got sick. Destiny stated that he "started puking out a lot of blood" and he was taken by ambulance to the hospital; he eventually passed away. The family then moved to an apartment in Gering, and Brian later moved in with them.

Destiny stated that she and Amber cared for the younger children, even when Claudia was present. They got the children dressed and fed them, Amber cooked, and Destiny "cleaned up after them." Destiny acknowledged that Claudia had physically hurt her; "she used her hand a lot and she would throw stuff sometimes," "[t]here was [sic] some times she used a frying pan." Destiny also witnessed Claudia physically harm her siblings; Claudia "hit them on their bottoms and

sometimes face." Destiny witnessed Claudia use drugs like marijuana and "coke," and Claudia would offer drugs to Destiny and Amber. Destiny did not feel safe when she lived with Claudia. She described her relationship with Claudia as "bad," and denied that it had ever been good. Destiny did not want a relationship with Claudia and wanted Claudia's parental rights terminated.

Garret Blankenship, a clinical psychologist, did not testify at the hearing, but his deposition was received into evidence without objection. Blankenship began working with Amber in April 2020, and continued to see her on a weekly basis. She was diagnosed with posttraumatic stress disorder and a depressive disorder. The posttraumatic stress disorder stemmed from her experiences with her mother. "In addition to nearly being thrown from [the back of] a moving truck" and being left at a hospital by her mother, Amber "has experienced multiple different times where she has been left to fend for herself and her siblings for anywhere from a few days to over a couple of weeks," sometimes having to ration food because there was not enough, or going without food herself in order to feed her siblings. She was also exposed to physical violence and domestic violence. Blankenship described Amber's childhood as "[c]ruel, unusual, unnecessary, [and] completely bereft of anything looking like a mother figure that was warm, affectionate, caring, [or] considerate." Blankenship "never once heard [Amber] refer to her mom or her relationship with her mom with any level of positivity." When the juvenile court suspended visits with Claudia in June 2020, Amber's response was "immediate relief." During a subsequent incident when Claudia showed up at school, Amber was concerned that her mother was attempting to take her siblings and run. Moving forward, Amber does not want a relationship with her mother.

Lori Rodriquez-Fletcher, a clinical therapist, began working with Destiny in June 2020, and continued to see her on a weekly basis. Destiny was diagnosed with unspecified trauma and stressor-related disorder, a parent-child relational issue, and some specific learning disorders. Destiny identified some physical abuse, neglect, and feeling extremely fearful and unsafe. Destiny reported being slapped and being hit with a belt and a pan. However, Destiny said that Amber took the majority of the physical abuse because she would stand up to their mother and be the voice for all of siblings. Destiny also disclosed seeing her mother use drugs.

Rodriquez-Fletcher stated that Destiny reported moving a lot, and there was no closure in the moves. "[M]ost of the time there was no plan for a move. It was something that they often did if police became involved or they were being questioned at the school for attendance or if somebody had made contact with them." "[T]hey would oftentimes just pack up in the middle of the night, not necessarily taking all of their belongings, but some of their stuff, and then going to often a new state." Destiny has a hard time trusting people.

Rodriquez-Fletcher stated Destiny witnessed domestic violence between her mother and her mother's significant others. Destiny also talked about Amber being in the back of a truck and their mother driving erratically "to the point that Destiny felt that Amber was going to die or be killed," and Amber was gone for a period of time after that. Destiny still felt unsafe at times. There was a recent incident where her mother showed up to the school, and Destiny was worried that her mother was trying to take her younger siblings or that she would be kidnapped. Destiny did not want to go back to her mother, "[s]he's fearful about that." Destiny did not see her mother as a caregiver. According to Rodriquez-Fletcher, Destiny had suffered a "[v]ery high" level of neglect. Destiny needed to know what her future held, she needed normalcy and permanency.

Erika Hoagland, a clinical therapist, began working with Anthony, age 9, in April 2020, and continued to see him on a weekly basis. He was diagnosed with posttraumatic stress disorder, attention deficit/hyperactive disorder, and a depressive mood disorder. Hoagland stated that Anthony "reported seeing somebody die in front of his eyes." He also reported being sexually abused by one of Claudia's boyfriends. Anthony struggles with trust, relationships, and attachment. He "has a very disorganized attachment as far as he doesn't know which caregivers or which adults in his life are going to be there for him because the experiences that he's had growing up are I can't depend on other people to be there for me so I have to be there for myself." He reported living in nine different states, and having gone to 9 or 10 different schools. Anthony "had a lot of ruptures in relationships . . . moving in the middle of the night, not having the closure of saying goodbye." To be able to build trusting relationships Anthony needs consistency, and "[h]e needs support from multiple caregivers in multiple settings of his life: Therapy, home, school, even in his medical care."

Supervisor Armstrong testified that Anthony has muscular dystrophy which requires special physical care. He has leg braces that he has to sleep with, he cannot walk for very long, and he cannot do physical things. Medicaid was currently working on getting him a scooter so that he will be able to increase his mobility. He needs a caregiver that is in tune with the special needs of his body. Prior to being removed from Claudia's home, Anthony did not have consistent medical care; this was confirmed by Amber and Destiny in their depositions. Armstrong stated that when he first came into DHHS care, Anthony's life expectancy was "around his 20s," but now that he has had consistent medical care he is expected to live until around age 30 or 40.

Hoagland testified that Anthony has a really good relationship with Amber and views her as a mother figure. Amber is the closest attachment to a caregiver that he has had; she took care of him and was the one that was there for him. Anthony is not angry or upset with his mother, "[h]e just has expressed that he does not want a relationship with his mother at the present time." According to Hoagland, it is unusual to hear that from a child Anthony's age; it comes from "[t]he disorganized attachment, the inconsistency" and from "[f]eeling like I am not safe with Mom." Visitation with Claudia was inconsistent and Anthony "was excited when the visits did not happen."

Irma Torres, a mental health practitioner, did not testify at the hearing, but her deposition was received into evidence without objection. Torres worked with Jasmine, age 6, on a weekly basis from April to August 2020. The themes that emerged during play therapy were "[l]ots of anxiety, fears, safety concerns, her not feeling safe." Torres wanted to invite Claudia to therapy to work on her relationship with Jasmine. Torres reached out to Claudia "multiple times" by phone and left voicemails, but did not receive a call back. When Torres discussed bringing Claudia into therapy, Jasmine "would shut down," and said "'I don't want to talk about her,'" "'I don't want to see her.'" Torres stated that Jasmine needs a stable home that has structure and routine.

Claudia testified on her own behalf. She believed the children's removal was an error because the domestic violence that led to her arrest was "a lie"; but she acknowledged that the criminal case was still pending. Claudia stated that "[s]everal times" she did not get the invitations for Zoom visits. When she did have Zoom visits, the format created difficulties because that was not how she and her children normally talked to each other. Claudia did not believe that terminating her parental rights was in her children's best interests because she "took care of [her] kids." If her

rights were not terminated, she would continue to work on the case plan and recommendations in the court report.

In an order entered on October 30, 2020, the juvenile court terminated Claudia's parental rights to the children after finding by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(2) and (4), and that termination of her parental rights was in the children's best interests.

Claudia appeals the juvenile court's order.

## ASSIGNMENT OF ERROR

Claudia assigns that the juvenile court erred by finding it was in the children's best interests to terminate her parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the children's best interests. *In re Interest of Leyton C. & Landyn C., supra*.

Although Claudia does not specifically assign error to the grounds for terminating her parental rights, we briefly address those grounds for the sake of completeness. In its order terminating Claudia's parental rights to the children, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) and (4). Section 43-292(2) generally provides for termination of parental rights when the parent has neglected and refused to give the necessary care to the juvenile or a sibling of the juvenile.

The record before us is replete with evidence of neglect. For example, Claudia often left the children to fend for themselves for days or weeks at a time and she did not provide a sufficient food supply. As a teenager, Amber had to take on the caretaker role for her younger siblings, making sure they were bathed, fed, and got to school. Amber herself missed an entire year of school because Claudia did not enroll her in school. Additionally, the children suffered physical harm at the hands of Claudia. Our de novo review of the record clearly and convincingly shows that grounds for termination of Claudia's parental rights under § 43-292(2) were proven by sufficient evidence.

Any one of the bases for termination of parental rights codified by § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Leyton C. & Landyn C., supra*. Having determined that the State proved § 43-292(2) as a statutory ground for termination, we need not consider the

sufficiency of the evidence concerning § 43-292(4). The next inquiry is whether termination is in the children's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit. *In re Interest of Leyton C. & Landyn C., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

The evidence reveals that the children suffered instability and neglect for a number of years. They have been subjected to physical harm by Claudia, and witnessed domestic violence and drug use by Claudia; Claudia even offered drugs to Amber and Destiny. In her deposition, Amber stated that Claudia "wasn't a mother." Blankenship described Amber's childhood as "[c]ruel, unusual, unnecessary, [and] completely bereft of anything looking like a mother figure that was warm, affectionate, caring, [or] considerate." It is clear from the evidence that prior to the children's removal, Amber, and to some extent, Destiny, were the caretakers for the younger siblings.

The children did not feel safe with Claudia. All four children expressed that they do not want to see or talk to Claudia, and the three oldest stated that they do not want a relationship with her. Amber believed termination was "what's best" because Claudia was "just not capable of being a mother." "She's not capable of taking care of children. She's not capable of providing the necessities a child needs to happily and safely grow up." Destiny also wanted Claudia's parental rights terminated. According to Armstrong, Claudia had neglected the children, including neglect of even the most basic human needs. Armstrong stated that DHHS supported the termination of Claudia's parental rights.

These children need and deserve safety, stability, consistency, and permanency--all necessities noted by the various therapists, and necessities that Claudia was unable or unwilling to provide. We find that the State has rebutted the presumption of parental fitness as to Claudia. We further find that there is clear and convincing evidence that it is in the best interests of the children to terminate Claudia's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Claudia's parental rights to Amber, Destiny, Anthony, and Jasmine.

AFFIRMED.